MARIE A. ZINK, Widow of John A. Zink, Deceased, *v.* KESSLER TRUCKING COMPANY; MARIE A. ZINK, Widow, etc., *v.* LAWRENCE PINIGORO; LILLIAN HARTLEY, Widow of Thomas Hartley, Deceased, *v.* KESSLER TRUCKING COMPANY; LILLIAN HARTLEY, Widow, etc., *v.* LAWRENCE PINIGORO.

(*January* 8, 1937.)

LAYTON, C. J., HARRINGTON and RODNEY, J. J., sitting.

*Herbert H. Ward, Jr.,* (of Ward and Gray) for *plaintiffs.*

*William Prickett* for defendants.

Superior Court for New Castle County, Nos. 109, 110, 111 and 112, September Term, 1935.

* * *

LAYTON, C. J., delivering the opinion of the Court:

The demurrers to the first count of the several declarations must be sustained for the reason that no actionable negligences are alleged. It is to be presumed that the pleaders have stated their cases in the manner most favorable to themselves. *Schwartzman v. Wilmington Stores Co.,* 2 *W. W. Harr.* (32 *Del.*) 7, 117 *A.* 739; *Snavely v. Booth, et al.,* 6 *W. W. Harr.* (36 *Del.*) 378, 176 *A.* 649. The negligence alleged is the parking of the truck, which had not become disabled, on the improved or main traveled portion of the highway when it was practicable to park the truck off of that portion of the highway, and in such manner as not to leave thereupon opposite the truck a clear and unobstructed width of not less than 15 feet, and so that a clear view of the truck could not be obtained from a distance of 200 feet in the direction from which the automobile was approaching. There is no averment that by reason of existing circumstances and conditions the driver of the automobile could not see the truck in time to have avoided the collision.

The violation of the statute constituted, of course, negligence *per se,* but the violation became an actionable wrong only if the injuries complained of resulted proximately therefrom. Generally the negligence of the operator of an automobile is not imputed to a passenger, but if the operator could have seen, or in the exercise of reasonable care, should have seeen, the truck in time to render abortive the defendant's negligence, his negligence, in such case would constitute the proximate or effective

legal cause of the collision and resulting injuries. See *Island Express v. Frederick,* 5 *W. W. Harr.* (35 *Del.*) 569, 171 *A.* 181. All that is alleged is that, by reason of the failure of the defendants to obey the provisions of the statute, the front of the automobile came in contact with the rear of the truck, whereby the death occurred. A material factor is the inability of the operator to see the truck in time to avoid the collision. The inability to see, of course, may have been due to the fact that, in the circumstances, a clear view of the truck could not be had from a distance of 200 feet, but it is elementary that facts should be averred directly and positively and not by way of inference or conclusion.

The second counts are based upon the statute requiring, during certain hours and in certain conditions, the display upon parked vehicles of a lamp projecting a red light visible under normal atmospheric conditions from a distance of 500 feet to the rear of the vehicle. These counts allege the failure to display the required light, and aver that by reason thereof the driver of the automobile was not warned of the presence of the truck parked upon the highway. The defendants urge that the phrase "was not warned," is not synonymous with an allegation that the driver did not know of the presence of the truck. Good pleading requires reasonable certainty and precision in order that the oppsoite party may know what he must meet at the trial. The word "warn" means notice, information or intimation of approaching or probable danger. The averments inform the defendants that by reason of their failure to display the lights as required by law, the driver of the automobile was not given notice of the presence of the truck upon the highway, as a result of which the collision occurred. The causal connection between the violation of the statute and the injuries sufficiently appears. No useful purpose is served by an insistence upon mere technicality. See *State v. Benton* (*Del. O. & T.*), *supra* 1, 187 *A.* 609.

The same objection is made to the fourth counts based upon requirements as to clearance lights, and what has been said with respect to the objection to the second counts is applicable. The demurrers to the second and fourth counts are overruled.

■■ The third counts allege the failure of the truck to carry at the rear thereof a lamp of a type approved by the Commissioner, exhibiting a red light plainly visible from a distance of 500 feet to the rear thereof. These counts cannot be sustained. We are not dealing with that aspect of the statute which provides for punishment for the failure to carry a lamp of a type approved by the Commissioner. Our concern is to examine the pleadings to see whether there is averred a causal connection between the violation of the statute and the injuries for which recompense is sought. As an administrative measure, conducive generally to the public safety, it is entirely proper that the Commissioner have the power to approve or disapprove types of lamps to be carried on vehicles using the public highways as a means of prevention against the use of inefficient types, but the efficiency of the light, or the lack thereof, is to be found in the lamp, not in the Commissioner's conclusion. The approval or disapproval, of itself, has nothing to do with causation. If the lights carried do not attain the standard of efficiency required by the statute, the Commissioner's approval will not supply the deficiency; and, conversely, if the lights do attain such standard, it cannot be said that the non-approval thereof has lessened their efficiency as a warning of danger. If the counts in question are sufficient it follows that the defendants may be held liable to respond in damages for consequences which do not result from a failure to employ an efficient lamp, but from the fact that the particular type of lamp has not received approval, although in all respects the lamp may be of equal or greater efficiency when compared with those which have

been approved. The pleader has based the cause of action upon his conception of the statute. His theory seems to be that a cause of action accrued to the plaintiffs by reason of the failure of the defendants to carry lamps of an approved type, notwithstanding the light projected therefrom may have been visible from the required distance. It is not every violation of law that will give rise to an action for damage, for where the injuries for which compensation is sought cannot be traced proximately to the violation of law, there can be no recovery. See *Lindsay v. Cecchi*, 3 *Boyce* 133, 80 *A.* 523, 35 *L. R. A.* (*N. S.*) 699.

By the demurrers to the fifth counts the constitutionality of *Chapter* 23, *Vol.* 38, *Laws of Delaware*, commonly known as the "Flare Statute," is questioned as constituting a denial of the equal protection of the laws under the *Fourteenth Amendment* of the *Federal Constitution*.

The *Fourteenth Amendment* forbids any State to "deny to any person within its jurisdiction the equal protection of the laws." The way of escape from the prohibition is by classification. *Chicago, Milwaukee & St. Paul Ry. Co. v. Westby* (*C. C. A.*), 178 *F.* 619, 47 *L. R. A.* (*N. S.*) 97. The cases are multitudinous. It is not the formula, but the application of it to a concrete case, that causes difficulty.

In *Lindsley v. Natural Carbonic Gas Co.*, 220 *U. S.* 61, 31 *S. Ct.* 337, 55 *L. Ed.* 369, *Ann. Cas.* 1912 *C*, 160, rules derived from repeated decisions of the court are stated for testing the contention of denial of equality before the law. Shortly stated they are: 1. The equal protection clause does not take from the State the power to classify in the adoption of police laws, if done upon some reasonable basis, and not purely arbitrary. 2. Such reasonable basis does not demand mathematical nicety or absolute equality. 3. When classification is questioned, if any state of facts reasonably

can be conceived that would sustain it, the existence thereof must be assumed. 4. The burden is upon him who assails the classification to show its unreasonableness.

The plaintiffs rely largely upon certain decisions of the Supreme Court of the United States. These will be considered briefly.

In *Patsone v. Pennsylvania*, 232 *U. S.* 138, 34 *S. Ct.* 281, 58 *L. Ed.* 539, there was under review a statute of Pennsylvania prohibiting the killing of any wild bird or animal by unnaturalized foreign born residents, and to that end, making it unlawful for any such person to own or be possessed of a shot gun or rifle.

The statute was upheld, the Chief Justice dissenting. It was admitted that the discrimination presented a difficult question. The reasoning was this: A State may classify with reference to the evil to be prevented, and if the class discriminated against reasonably may be considered to define those from whom the evil mainly is to be feared, it may properly be selected. A lack of abstract symmetry does not matter, for the question is a practical one dependent upon experience. It is not enough to say that others may do the same thing and go unpunished, if it is found that danger is characteristic of the class named. It was emphasized that the subject of discussion was wild game which the State may preserve for its own citizens, and it was concluded that the court could not say that the legislature of Pennsylvania was not warranted in assuming that resident unnaturalized aliens were less interested in the preservation of wild game than were citizens, and therefore a peculiar source of evil at which legislation might be directed. It was enough that the Court had no such knowledge of local conditions as to be able to say that the legislature was manifestly wrong.

In *Sproles et al. v. Binford*, 286 *U. S.* 374, 52 *S. Ct.* 581, 76 *L. Ed.* 1167, a statute of Texas, designed to protect high-

ways by limiting the width, length and load of motor vehicles, was before the Court. Certain machinery and implements of husbandry were exempted for short hauls. This exemption was held reasonable having in mind the purpose of the statute and the necessities of the case. Passenger buses were exempted from the operation of the statute with respect to weight limitation, and it was contended that this discrimination was unreasonable and arbitrary, and rendered the act unconstitutional, for the reason that damage to highways was as great from a load of persons as from a load of freight.

The Court said that this consideration would be controlling if there was no other reasonable basis for classification than the mere matter of weight, but in passing upon the constitutional power of the State to frame highway regulations, the fact could not be ignored that the State has a distinct public interest in the transportation of persons, to provide its communities with resources both of employment and recreation, and to foster varied social and educational interests dependent upon freedom of intercourse through safe and accessible facilities; and that such considerations were sufficient to support a classification of passenger traffic as distinct from freight.

In *Keokee Consolidated Coke Co. v. Taylor,* 234 *U. S.* 224, 34 *S. Ct.* 856, 58 *L. Ed.* 1288, a statute of West Virginia was considered. The statute forbade any person or company engaged in mining coal or ore, or manufacturing iron or steel, to issue for payment of labor any order, unless it purported to be redeemable on its face in lawful money. It was urged that the act discriminated unconstitutionally against certain classes. The Court, however, said that it was established by repeated decisions that a statute aimed at what is deemed an evil, and hitting it presumably where experience shows it to be most felt, is not to be upset by thinking up and enumerating other instances to which it

might have been applied equally well, so far as the court could see. That was for the legislature to judge unless the case was very clear, so that the suggestion that others, besides mining and manufacturing companies, might keep shops and pay their workmen with orders on themselves for merchandise was not enough to overthrow a law that must be presumed to be deemed by the legislature coextensive with the practical need.

In *Miller v. Wilson,* 236 *U. S.* 373, 35 *S. Ct.* 342, 59 *L. Ed.* 628, *L. R. A.* 1915 *F.* 829, the Court had under review a statute of California forbidding employment of females for more than eight hours a day in any manufacturing, mechanical, or mercantile establishment, laundry, hotel, or restaurant or telegraph or telephone establishment or office, or by any express or transportation company. The statute expressly exempted women employed in the harvesting, curing, canning, or drying of any variety of perishable fruit or vegetable. Impliedly were exempted women employed in boarding and lodging houses, domestic servants, and stenographers, clerks and assistants employed by professional classes. The case arose over the employment of a chambermaid in a hotel. The Court said that the legislature was not debarred from classifying according to general considerations and with regard to prevailing conditions; that hotels, as a class, maintain a special organization to supply a distinct and exacting service; that the female employees are, for the most part, chambermaids and waitresses, and that it could not be said that the conditions of work were identical with these which obtain in establishments of a different character, or that it was beyond the legislative power to recognize the existing differences, so that the legislature was free to recognize degrees of harm, and it might confine its restrictions to those classes of cases where the need was deemed to be the clearest.

In *Silver v. Silver,* 280 *U. S.* 117, 50 *S. Ct.* 57, 74 *L. Ed.*

221, 65 *A. L. R.* 939, a statute of Connecticut, denying recovery to gratuitous passengers in automobiles for injury, death or loss arising out of the negligence of the owners or operators thereof except in the cases of intentional accidents, heedlessness, or reckless disregard of the rights of others, was upheld. There the Court held that, in this day of almost universal highway transportation by motor car, it could not say that abuses originating in the multiplicity of suits growing out of the gratuitous carriage of passengers do not present so conspicuous an example of what the legislature may regard as an evil as to justify legislation aimed at it, even though some abuses may not be hit.

A similar statute was upheld by this Court in *Gallegher v. Davis*, 7 *W. W. Harr.* (37 *Del.*) 380, 183 *A.* 620.

■ It is quite clear from the authorities that the "equal protection" clause of the Fourteenth Amendment does not debar the State from the exercise of a wide discretion in classification in the adoption of police laws. The plaintiffs, however, have laid emphasis upon certain expressions culled from the opinions in the cited cases. For example, it is said that the legislative act need not be all embracing; that it need not cover the whole field of possible abuses; that a lack of abstract symmetry does not matter; that the legislature is not held rigidly to the choice of regulating all or none; and that a legislative act is not to be upset by thinking up and enumerating instances to which it might have been applied equally well.

■ These expressions do not stand alone as expressive of a rule. They must be considered in the light of the settings in which they were uttered, and they are all predicated upon the principle that the classification must be based upon some real and substantial distinction bearing a reasonable and just relation to the things with respect to which the classification is imposed. Where the classification

is reasonable, and not arbitrary, and rests upon some ground of difference having a fair and substantial relation to the object of legislation, so that all persons similarly circumstanced shall be treated alike, the fact that the legislation does not cover the whole field of possible evils will not render the act void.

In each of the cited cases there was "a peculiar source of evil" against which the legislation was directed, either easily recognizable, or of such nature that the reviewing Court could not say that the legislature was manifestly wrong.

The evil aimed at by the statute here attacked was the personal injuries, loss of life and destruction of property caused by striking obstructions in the public highways. The act was made applicable to motor trucks and motor buses only. Trucks were not classified with respect to length, width, size or weight. The statutory definition of "highway" is "every way or place of whatever nature open to the use of the public as a matter of right for purposes of vehicular travel." *Section 1 (u), Chapter 10, Vol. 36.* The *Act,* consequently, applies to the whole of the highway, not merely to the paved, or improved or main traveled portion. The effect of the statute was to subject to criminal punishment and to civil liability the operator of a motor truck or motor bus who should fail to put out, within the specified time, torches or lights as required, while operators of other vehicles' on the highways, were relieved of like consequences.

Trucks generally may be defined as wheeled vehicles for the carrying of heavy loads. But, in considering the fact of obstructions in a highway as constituting an evil, the term, "heavy" is relative and means little. So, the question is whether the stopping of trucks and buses within the limits of a highway can reasonably be said to constitute a peculiar source of evil at which the legislature may be per-

mitted to strike because, from experience, it was with respect to them that the evil was most felt, or from which the evil to be prevented was mainly to be feared.

The plaintiffs concede that trucks and buses are no more likely to become disabled on the highways than ordinary pleasure cars, but they suggest as reasonable bases for classification that, due to their weight, it is not easy, and sometimes impossible, to move them off the road in order to repair them, and certainly, they cannot be readily pushed off the road within three minutes, as pleasure cars may be; that a collison with a parked truck or bus is likely to result in greater damage to property and to be attended with more fatal results, than wouud result from collison with a vehicle of less weight; and that since the parking of trucks on the highway is frequently necessary to enable their operators to rest while making long runs, and since it is sometimes necessary to park buses on highways for schedule or connection purposes, the parking of them on the highways is more to be anticipated that is the case with pleasure cars whose operators usually are making short trips and need not to rest, or are going somewhere for amusement, and, therefore, are not so likely to park their cars on the highways, or, if they do, will park them on the side of the road.

It is impossible to accept these suggestions as reasonable bases for the discriminatory legislation.

The statute applies to the whole highway, not to the improved or main traveled portion of it, and this without exception or qualification. Trucks and buses are not classified as to kind, character, size or weight. Their operators are not relieved of the consequences imposed by the statute for the failure to set the required lights even if they park their vehicles entirely off the main traveled portion of the highway. Having in mind the statutory definition of "high-

way," clearly the court may not construe the word to mean the improved, paved or main traveled portion of it.

The usual small pleasure car is a ton and a half in weight. Some large cars weigh twice as much. Many pleasure cars are as heavy as many trucks. All are of a sufficient size and weight as to constitute dangerous obstructions in the highway. Instances of collisions with pleasure cars parked in the highway resulting in the practical ruin of the vehicles and in deaths of the occupants are so numerous that it is impossible to regard difference in weight as a reasonable basis for the classification made by the statute. Nor may it be said that pleasure cars are parked on the highway less frequently than are trucks and buses. We cannot be blind to the fact that, for whatever purpose, pleasure cars are to be found parked within the limits of the highways constantly and numerously.

It is conceded that constitutional limitations are not so rigid as preclude a practical application of the legislative power, and it is also conceded that, under the police power, the question of classification is for legislative determination unless the case is clear. Classification means a natural grouping of persons or things because of inherent characteristics which serve to distinguish the group from other persons or things. Substantial equality before the law is demanded by natural justice and by constitutional provisions. The legislature may not, therefore, split in two a natural class of persons and things, capriciously designate the severed parts as classes, and enact different rules for the government of each.

If the statute is to be upheld the court must be able to say that it is reasonable to conceive that trucks and buses at rest on the highway during the precribed hours of darkness, although showing the statutory warning lights, are a greater menace than other motor vehicles of, perhaps, similar size, width, weight and contour, and that they

constitute a peculiar source of evil. Experience does not lead to that conclusion. All kinds and classes of motor vehicles are found at rest on the highways. All are of sufficient size and weight as to constitute dangerous obstructions. The statute permits the operator of a pleasure car, regardless of weight or size, to remain at rest on the highways from dusk to dawn without penalty, criminal or civil, if equipped with the statutory warning lights. In the same circumstances it subjects to criminal punishment and, perhaps, to civil liability, the operator of a truck or bus of whatever size, weight, or shape unless additional warning lights are placed. The class of obstructions, equally dangerous, is split in two. Those responsible for the one class of obstruction suffer no penalty, while those causing the other class are punished criminally, and also may be subjected to civil liability arising out of negligence in law. The attempted classification is capricious and arbitrary, and cannot be sustained.

In *Consumers' Co. v. Chicago*, 298 *Ill.* 339, 131 *N. E.* 628, a city ordinance required motor vehicles of 1500 pounds capacity or more, designed for carrying freight and merchandise, to be equipped with a fender in front to prevent injury to pedestrians.

The court declared the ordinance to be void. It said that while classification in certain bounds was lawful, yet the classification must be based upon some substantial difference which bears a proper relation to the classification; but that with respect to the matter before it, it clearly appeared that there was no characteristic difference, so far as the object sought to be accomplished was concerned, between trucks with a capacity of 1500 pounds or more and the smaller trucks and passenger cars and various types of special motor vehicles; that the ordinance unreasonably discriminated between persons similarly situated, and was

in violation of the State and Federal Constitutional provisions.

In *Smith v. Cahoon*, 283 *U. S.* 553, 51 *S. Ct.* 582, 587, 75 *L. Ed.* 1264, a Florida Statute defined "auto transportation companies" so as to include both common and private motor carriers for compensation over public highways between fixed termini or over regular route, but excepted, *inter alia*, those engaged exclusively in transporting agricultural, horticultural, dairy or other farm products, and fish, oysters and shrimp from the point of production to the assembling or shipping point en route to primary markets. It required the carriers coming within its provisions to obtain certificates of public convenience and necessity, and to give a bond or insurance policy for the protection of the public against injuries, and of persons and property carried.

The statute was held to be unconstitutional. The Court affirmed the principle that the State, has a broad discretion in classification in the exercise of its power of regulation, subject, however, to the interposition of the constitutional guaranty of equal protection of the laws against arbitrary discriminations. "In the present instance," it said, "the regulation as to the giving of a bond or insurance policy to protect the public generally, in order to be sustained, must be deemed to relate to the public safety. This is a matter of grave concern as the highways become increasingly crowded with motor vehicles, and we entertain no doubt of the power of the state to insist upon suitable protection for the public against injuries through the operations on its highways of carriers for hire, whether they are common carriers or private carriers. But, in establishing such a regulation, there does not appear to be the slightest justification for making a distinction between those who carry for hire farm products, or milk or butter, or fish or oysters, and those who carry for hire bread or sugar, or tea

or coffee." The Court concluded that the discrimination made by the statute was wholly arbitrary, as being a classification not based on anything having relation to the purpose for which it was made.

It will serve no useful purpose to comment upon the many authorities cited by the defendants in support of their contention. They are *Chicago, Milwaukee & St. Paul Ry. Co. v. Westby, supra; Gulf, Colorado & Santa Fe Ry. Co. v. Ellis,* 165 *U. S.* 150, 17 *S. Ct.* 255, 41 *L. Ed.* 666; *Royster Guano Co. v. Virginia,* 253 *U. S.* 412, 40 *S. Ct.* 560, 64 *L. Ed.* 989; *Southwestern Bell Telephone Co. v. Middlekamp (D. C.),* 1 *F.* (2d) 563; *Connolly v. Union Sewer Pipe Co.,* 184 *U. S.* 540, 22 *S. Ct.* 431, 46 *L. Ed.* 679; *State v. Le Barron,* 24 *Wyo.* 519, 162 *P.* 265, *Ann. Cas.* 1918 *D,* 998; *State ex rel. Greenberg v. Erickson,* 159 *Minn.* 287, 198 *N. W.* 1000; *Haynes v. Lapeer Circuit Judge,* 201 *Mich.* 138, 166 *N. W.* 938, *L. R. A.* 1918 *D,* 233; *State v. Osborne,* 171 *Iowa* 678, 154 *N. W.* 294, *Ann. Cas.* 1917 *E,* 497; *Consumers' Co. v. Chicago,* 298 *Ill.* 339, 131 *N. E.* 628; *Waters-Pierce Oil Co. v. Hot Springs,* 85 *Ark.* 509, 109 *S. W.* 293, 16 *L. R. A.* (*N. S.*) 1035; 6 *R. C. L.* title, *Const. Law,* §§ 374, 375.

The demurrers to the fifth counts are sustained.

HARRINGTON, J. (dissenting in part).

I regret that I am unable to agree with the conclusion reached by my associates with respect to the constitutionality of *Chapter* 23 of *Volume* 38, *Laws of Delaware* (*Section* 128 *A* of the *Motor Vehicle Code*), but, in all other respects, I agree with the conclusion reached by them.

The act in question provides:

"*Section* 1. That, it shall be unlawful for any person operating a motor truck or motor bus, upon the highways of the State of Delaware to stop said motor truck or motor bus, on said highway upon which it is being operated, for more than three minutes during the

time from one-half hour after sunset until one-half hour before sunrise, unless such person places a lighted torch or a lighted lantern containing red glass, not more than one foot from the edge of the concrete or traffic lane in the direction in which said motor truck or motor bus is being operated, and not more than one hundred and fifty feet, nor less than one hundred feet, back from the rear of said motor truck or motor bus; provided, nevertheless, that nothing in this Act shall apply to any person operating a motor bus while stopping for the purpose of taking on or discharging any passenger."

The declarations demurred to are based on negligence. In the *Hartley* cases they, among other things, allege, in substance, that on the twenty-eighth day of November, 1934, at about 6:30 in the evening, an International truck, with a semi-trailer attached to it, belonging to the defendant, was negligently parked by its agent on a public highway of this state for more than three minutes, without having complied with the provisions of the above statute, requiring him to place a lighted torch or a lighted lantern, containing red glass, a certain distance in the rear of it; and that by reason of that fact the plaintiff's husband, Thomas Hartley, who was a passenger in an automobile driven by another person, was unable to see the defendant's truck and the trailer attached thereto, so that the automobile in which he was then riding collided with the rear of that truck, and Hartley was killed.

The declaration in the *Zink* cases are similar.

In support of its demurrer, the defendant, among other things, contends that this statute violates the equal protection clause of the Fourteenth Amendment to the Constitution of the United States, and is, therefore, void. That amendment provides: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

In *Patsone v. Pennsylvania*, 232 *U. S.* 138, 34 *S. Ct.* 281, 282, 58 *L. Ed.* 539, the question to be determined was whether a legislative Act of the State of Pennsylvania, which made it unlawful for unnaturalized resident aliens to shoot wild game in that State, was valid, or whether the classification adopted was reasonable and, therefore, violated the Fourteenth Amendment to the Federal Constitution.

The Court said: "The discrimination undoubtedly presents a more difficult question. But we start with the general consideration that a state may classify with reference to the evil to be prevented, and that if the class discriminated against is or reasonably might be considered to define those from whom the evil mainly is to be feared, it properly may be picked out. A lack of abstract symmetry does not matter. The question is a practical one, dependent upon experience. The demand for symmetry ignores the specific difference that experience is supposed to have shown to mark the class. It is not enough to invalidate the law that others may do the same thing and go unpunished, if, as a matter of fact, it is found that the danger is characteristic of the class named. * * * The state 'may direct its law against what it deems the evil as it actually exists without covering the whole field of possible abuses.' * * *

"The question therefore narrows itself to whether this court can say that the legislature of Pennsylvania was not warranted in assuming as its premise for the law that resident unnaturalized aliens were the peculiar source of the evil that it desired to prevent. * * *

"Obviously the question, so stated, is one of local experience, on which this court ought to be very slow to declare that the state legislature was wrong in its facts. *Adams v. Milwaukee*, 228 *U. S.* 572, 583, 33 *S. Ct.* 610, 57 *L. Ed.* 971, 977. If we might trust popular speech in some

states it was right;—but it is enough that this court has no knowledge of the local conditions as to be able to say that it was manifestly wrong."

The general principles stated in this case have been repeatedly approved in subsequent cases.

In *Miller v. Wilson, Sheriff*, 236 *U. S.* 373, 35 *S. Ct.* 342, 344, 59 *L. Ed.* 628, *L. R. A.* 1915 *F*, 829, the court held that the California eight hour labor law for women was valid, though it excepted from its provisions persons employed in harvesting, curing, canning or drying any variety of fruit or vegetables. In discussing the question, it said: "Dealing with practical exigencies, the legislature may be guided by experience. *Patsone v. Pennsylvania*, 232 *U. S.* 138, 144, 34 *S. Ct.* 281, 58 *L. Ed.* 539, 543. It is free to recognize degrees of harm, and it may confine its restrictions to those classes of cases where the need is deemed to be clearest. As has been said, it may 'proceed cautiously, step by step,' and 'if an evil is specially experienced in a particular branch of business' it is not necessary that the prohibition 'should be couched in all-embracing terms.' * * * If the law presumably hits the evil where it is most felt, it is not to be overthrown because there are other instances to which it might have been applied."

In *Whitney v. California*, 274 *U. S.* 357, 47 *S. Ct.* 641, 646, 71 *L. Ed.* 1095, which involved the validity of an act relating to criminal syndicalism in certain specified cases only, the court said: "A statute does not violate the equal protection clause merely because it is not all-embracing. * * * A state may properly direct its legislation against what it deems an existing evil without covering the whole field of possible abuses. *Patsone v. Pennsylvania*, 232 *U. S.* 138, 144, 34 *S. Ct.* 281, 58 *L. Ed.* 539; *Farmers' & Merchants' Bank v. Federal Reserve Bank*, 262 *U. S.* 649, 661, 43 *S. Ct.* 651, 67 *L. Ed.* 1157, 30 *A. L. R.* 635; *James-Dickin-*

*son Farm Mortg. Co. v. Harry, supra* [273 *U. S.* 119, 47 *S. Ct.* 308, 71 *L. Ed.* 569]. The statute must be presumed to be aimed at an evil where experience shows it to be most felt, and to be deemed by the Legislature coextensive with the practical need; and is not to be overthrown merely because other instances may be suggested to which also it might have been applied; that being a matter for the Legislature to determine unless the case is very clear. * * * And it is not open to objection unless the classification is so lacking in any adequate or reasonable basis as to preclude the assumption that it was made in the exercise of the legislative judgment and discretion."

In *Sproles v. Binford, Sheriff,* 286 *U. S.* 374, 52 *S. Ct.* 581, 585, 76 *L. Ed.* 1167, the court held that a legislative act, apparently intended for the protection of the public highways of the State of Texas, did not violate the Fourteenth Amendment to the Constitution of the United States. The act prescribed the width, length and weight of motor vehicles that could be operated on such highways but excepted from its provisions implements of husbandry, road machinery and vehicles used in transporting property from its point of origin to the nearest practicable common carrier loading depot.

The provisions as to weight applied to commercial vehicles, but did not apply to buses.

The Court said: "When the subject lies within the police power of the state, debatable questions as to reasonableness are not for the courts but for the Legislature, which is entitled to form its own judgment, and its action within its range of discretion cannot be set aside because compliance is burdensome."

The Court, also, said: "This is not a case of a denial of the use of the highways to one class of citizens as opposed to another or of limitations having no appropriate relation

to highway protection. It is not a case of an arbitrary discrimination between the products carried, as in the case of *Smith v. Cahoon*, 283 *U. S.* 553, 567, 51 *S. Ct.* 582, 75 *L. Ed.* 1264."

The same court, in commenting on the fact that buses, though fully as heavy when loaded as other motor vehicles referred to in the act, were not included within its provisions, further said: "Appellants press the contention that * * * the damage to the highways is as great from a load of persons as from a load of freight, and that the combined weight of vehicles and load in the case of passenger buses is greater than the combined weight of vehicles and load carrying freight where the net load is limited to 7,000 pounds. These considerations would be controlling if there were no other reasonable basis for classification than the mere matter of weight. But in passing upon the question of the constitutional power of the state to fashion its regulations for the use of the highways it maintains, we cannot ignore the fact that the state has a distinct public interest in the transportation of persons. *We do not think that it can be said that persons and property, even with respect to their transportation for hire, must be treated as falling within the same category for purposes of highway regulation.* The peculiar importance to the state of conveniences for the transportation of persons in order to provide its communities with resources both of employment and of recreation, the special dependence of varied social and educational interests upon freedom of intercourse through safe and accessible facilities for such transportation, are sufficient to support a classification of passenger traffic as distinct from freight."

*Silver v. Silver*, 280 *U. S.* 117, 50 *S. Ct.* 57, 58, 74 *L. Ed.* 221, 65 *A. L. R.* 939, involved the constitutionality of the Connecticut statute, which prohibited an action for negligence by a gratuitous passenger in an automobile

against the driver of such automobile. The court, after pointing out that the use of automobiles as an instrument of transportation was peculiarly the subject of regulation in the statute, and that it could not be assumed that there were no evils to be corrected by it said: "We are not unaware of the increasing frequency of litigation in which passengers carried gratuitously in automobiles, often casual guests or licensees, have sought the recovery of large sums for injuries alleged to have been due to negligent operation. * * * Whether there has been a serious increase in the evils of vexatious litigation in this class of cases, where the carriage is by automobile, is for legislative determination, and, if found, may well be the basis of legislative action further restricting the liability. Its wisdom is not the concern of courts. * * * In this day of almost universal highway transportation by motorcar, we cannot say that abuses originating in the multiplicity of suits growing out of the gratuitous carriage of passengers in automobiles do not present so conspicuous an example of what the Legislature may regard as an evil, as to justify legislation aimed at it, even though some abuses may not be hit. * * *It is enough that the present statute strikes at the evil where it is felt and reaches the class of cases where it most frequently occurs."

Precisely the same general principles were applied in sustaining the legislative acts before the court in *People of State of New York ex rel. Bryant v. Zimmerman*, 278 *U. S.* 63, 49 *S. Ct.* 61, 73 *L. Ed.* 184, 62 *A. L. R.* 785, and in *Keokee Consol. Coke Co. v. Taylor*, 234 *U. S.* 224, 34 *S. Ct.* 856, 857, 58 *L. Ed.* 1288. In the first of these cases the statute required associations having an oath-bound membership to file sworn copies of their constitutions, oaths, etc., but excepted Masonic societies, Odd Fellows, and Knights of Columbus. In the latter case, the statute forbade any person or company engaged in mining coal or ore, or manufac-

turing iron or steel, to pay for labor by orders, unless redeemable in cash.

In this case, after stating the general rules applicable, and citing, among other cases, *Patsone v. Pennsylvania,* 232 *U. S.* 138, 34 *S. Ct.* 281, 58 *L. Ed.* 539, *supra,* the court, also, said:

"The suggestion that others besides mining and manufacturing companies may keep shops and pay their workmen with orders on themselves for merchandise is not enough to overthrow a law that must be presumed to be deemed by the legislature coextensive with the practical need."

Such are the well settled general principles governing cases of this character. In fact, this is not disputed, but the difficulty is to apply these principles to the facts of a particular case, and from those facts to determine whether the particular classification adopted by the legislature is reasonable, or so clearly arbitrary and unreasonable as to rebut the usual presumptions in support of the validity of the action taken by it. The precautionary measures provided for in the act before us do not apply to motor vehicles of the pleasure type. By reason of that fact, the majority of the court have reached the conclusion that as that act is intended for the protection of other travelers on the highway, it is unreasonable to require those precautions to be taken by trucks and buses alone, particularly as there are no limitations or other provisions relating to size or weight.

It must be conceded that almost any kind of a vehicle, whether motor or otherwise, parked or left standing on a public highway at night, may be a possible source of danger to other persons traveling on that highway, though such parked vehicle carries the usual lights required by other provisions of the motor vehicle act. This would be as true of a timber or so-called log wagon, or other heavy wagon

or cart of the same general nature, and whether such wagon or cart were loaded or not, as of any motor vehicle other than a truck or bus; but it could not be contended that the exclusion from this act of vehicles of that type makes it invalid.

As was pointed out in the above cases, a legislative act to be valid need not be all embracing; if the abuses or dangers sought to be met are, or even may be, characteristic in a peculiar degree of the particular kinds of motor vehicles covered by it, the act is valid though other possible sources of danger are not included in the classification adopted.

The legislature can proceed cautiously step by step, and the clear presumption is that an act enacted by it is co-extensive with the real existing practical need; that it is aimed at dangers where experience shows action to be most needed. In other words, if the reasonableness of the legislative classification adopted is even fairly debatable, the legislative judgment will be allowed to control, and the act will be valid. *In re Ceresini,* 8 *W. W. Harr.* (38 *Del.*) 134, 189 *A.* 443; *Sproles v. Binford,* 286 *U. S.* 374, 52 *S. Ct.* 581, 76 *L. Ed.* 1167.

Bearing these principles in mind, can we say that the classification adopted by the act before us is so clearly and palpably unreasonable because it does not include ordinary pleasure vehicles, as well as motor trucks and buses, that all presumption in favor of its legality are overthrown?

The statute that is being questioned relates to public highways in general, and is not confined to a particular class of highways, such as paved roads.

A truck is "a wheeled vehicle, of which there are many kinds, used for moving or transporting burdens" (*Cent. Dict.*); "a strong vehicle for transporting freight, merchandise and other heavy articles" (65 *C. J.* 178; *Stand.*

*Dict.; Hemlock, etc., Tire Co. v. McLemore,* 151 *Tenn.* 99, 268 *S. W.* 116) ; "any strong, heavy cart, or wagon, horse-drawn or self propelled, for heavy hauling." (*Web. Inter. Dict.*).

Distinctly as a motor vehicle, naturally a truck is still defined in somewhat the same manner. It is "an automoblie for transporting heavy loads" (65 *C. J.* 175; *New Cent. Dict.; Paltani v. Sentinel Life Ins. Co.,* 121 *Neb.* 447, 237 *N. W.* 392) ; "a large automotive vehicle for freight transportation (*Web. Int. Dict.*) ; "a wheeled vehicle for carrying heavy loads; especially a large motor vehicle for such purposes" (*The Winst. Univ. Ref. Libr.*).

The inclusion of motor buses in the act in question would, also, seem to strengthen the conclusion that it was intended to apply to a class of vehicles usually typified in the public mind by a certain degree of size and weight. The word "bus" is derived from, "omnibus," and when a motor vehicle of that type is referred to, means a motor coach (*Web. Inter. Dict.; Dent. Dict.*) ; and because of the derivation of the word such a coach would naturally signify a vehicle for the transportation of a number of persons.

There is nothing in the motor vehicle act that is inconsistent with these definitions, and the words "motor truck," as therein used, therefore, seemingly refer to a vehicle having both sufficient size and weight for the transportation of freight or heavy loads of some character.

Depending on their intended uses, both trucks and buses naturally vary in size and weight. Some of them may be little or no larger or heavier than other motor vehicles of the pleasure type, but, as I view it, that does not necessarily affect the question involved.

In the conception of the public, as well as in actuality,

there is a difference between a truck and a motorized pleasure vehicle not intended to carry freight or other heavy loads.

As I have already pointed out, there is, also, a distinct difference between a motor bus and an automobile intended for mere pleasure purposes. Nor am I prepared to say that the legislature was clearly wrong in taking the position that experience had shown that trucks and buses parked on the highway at night are a greater source of danger to the public than ordinary motor vehicles.

My conclusion, therefore, is that the classification adopted by the act before us is not so clearly unreasonable that it is void.

As I read that case, *Smith v. Cahoon,* 283 *U. S.* 553, 51 *S. Ct.* 582, 587, 75 *L. Ed.* 1264, is not inconsistent with this conclusion, as our statute includes all trucks parked on the public highways at night, and is not confined to trucks merely loaded with specified products.

In that case, the statute required all public or private carriers for hire, using the public highways of the State of Florida, to procure a certificate of public convenience, and to give a bond or pledge an insurance policy for the protection of public safety and property rights. By its language that statute was not only restricted to carriers for hire using the public highways, but it, also, excepted from its provisions corporations or persons engaged exclusively in transporting children to or from school, or any company engaged exclusively in transporting agricultural or dairy products, or fish and oysters, from the point of production to the nearest shipping point for the primary market. The court said: "In determining what is within the range of discretion and what is arbitrary, regard must be had to the particular subject of the state's action. In the present instance, the regulation as to the giving of a bond or insur-

ance policy to protect the public generally, in order to be sustained, must be deemed to relate to the public safety. This is a matter of grave concern as the highways become increasingly crowded with motor vehicles, *and we entertain no doubt of the power of the state to insist upon suitable protection for the public against injuries through the operations on its highways of carriers for hire, whether they are common carriers or private carriers.*"

While no such question is before us, the court, also, said: "But, in establishing such a regulation, there does not appear to be the slightest justification for making a distinction between those who carry for hire farm products, or milk or butter, or fish or oysters, and those who carry for hire bread or sugar, or tea or coffee, or groceries in general, or other useful commodities."

*Consumers' Co. v. Chicago,* 298 *Ill.* 339, 131 *N. E.* 628, also, involved a very different state of facts. The city ordinance, which was held to be unreasonable and, therefore, void, required all motor vehicles intended for transportation of freight or merchandise, and having a capacity of 1500 lbs. or more, to be equipped with fenders or bumpers in front for the protection of pedestrians.

It seems unnecessary for me to consider any of the other cases cited by the defendant.

For the reasons above given, I think the demurrer to the fifth count of the declaration in each case should be overruled.